## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| JAVIER MORALES VERA,<br><br>       Plaintiff,<br><br>v.<br><br>EXPERIAN INFORMATION<br>SOLUTIONS, INC.,<br><br>       Defendant. | Case No.<br><br><br>**COMPLAINT AND DEMAND FOR<br>JURY TRIAL** |

Plaintiff Javier Morales Vera ("Plaintiff") brings this action on an individual basis, against Defendant Experian Information Solutions, Inc. ("Experian") for actual, statutory, and punitive damages and costs, and attorney's fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et. seq.*, arising out of Experian's mixing Plaintiff's credit file with that of another consumer.

## INTRODUCTION

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is

intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, Experian acknowledges this potential for misuse and resulting damage every time it sells its respective credit monitoring services to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.      Since 1970, when Congress enacted the FCRA, federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and

sell about individual consumers.

6.    "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies." *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

7.    Congress made the following findings when it enacted the FCRA in 1970:

(a)    The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

(b)    An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

(c)    Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.

(d)    There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a)(1-4).

8.    Thus, one of the fundamental purposes of the FCRA is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in

accordance with the requirements of this subchapter." 15 U.S.C. § 1681(b). Accordingly, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

9.     The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

10.     Since 1970, when Congress enacted the FCRA, as amended, 15 U.S.C. § 1681 *et. seq.*, the federal law has required CRAs to have in place and to utilize reasonable procedures "to assure the maximum possible accuracy" of the personal and financial information that they compile and sell about individual consumers.

11.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record

the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

12.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U.S.C. § 1681(a)(4).

13.     The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

14.     A recurring and known issue within the credit reporting industry is the creation of "mixed files."

15.     A "mixed file" occurs when personal and credit information belonging to Consumer B appears in one or more of Consumer A's credit files.

16.    "Mixed files" create a false description and representation of a consumer's credit history.

17.    The Federal Trade Commission ("FTC") defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is subject to that Consumer Report." *F.T.C. v. TRW, Inc.*, 784 F. Supp. 361, 362 (N.D. Tex. 1991).

18.    Mixed files are not a new phenomenon. Experian has been on notice of the existence of mixed files, and the fact that its procedures for creating credit files, including its matching algorithms, are prone to frequently cause mixed files, for over forty (40) years. *See Thompson v. San Antonia Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

19.    More recently, Experian has been the subject of numerous state attorney general actions relating to its mixed file problem.

20.    For example, in 2015, the New York Attorney General filed charges and settled claims with Experian over mixed files.[1] *See In the Matter of Eric T. Schneiderman, Attorney General of the State of New York v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC.*

---

[1] https://ag.ny.gov/press-release/2015-ag-schneiderman-announces-groundbreaking-consumer-protection-settlement-three Last visited May 17, 2022; *see also* https://ag-ny.gov/pdfs/CRA%20Agreement%20Fully%20Executed%203.8.15.pdf Last visited May 17, 2022.

21.    Notwithstanding Experian's notice and being subject to repeated enforcement actions, mixed files continue to occur despite consumers' unique personal identifying information, such as Social Security Numbers, date of birth, and addresses.

22.    Another consequence of mixed files is the resulting disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge or consent, or both. This occurs when a consumer's file is mixed with that of another consumer, and either of those consumers applies for credit, housing, insurance, or employment, and Experian sells information pertaining to one consumer in response to the application of the other.

23.    Experian has been sued thousands of times wherein an allegation was made that Experian violated the FCRA. Moreover, Experian is sued, at a minimum, hundreds of times each year wherein an allegation is made that Experian mixed a consumer's credit file with that of another consumer.

24.    FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who fall victim to a mixed credit file.

25.    For example, in 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case NO. 00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them despite Ms. Thomas's numerous disputes.

The jury awarded Ms. Thomas $300,000.00 in actual damages and $5,000,000.00 in punitive damages.

26.    In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000.00 in actual damages and $2,700,000.00 in punitive damages for willfully violating the FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes.

27.    In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000.00 in actual damages and more than $18,000,000.00 in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them despite Ms. Miller' numerous disputes.

28.    More recently, a jury assessed a $60 million dollar verdict against Trans Union for mixing innocent persons as terrorists and drug dealers by matching consumers with the Office of Foreign Asset Control's "terrorist alert" list based on first and last name alone. *See Ramirez v. Trans Union, LLC*, No. 12-CV-00632-JSC, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), *aff'd in part, vacated in part, rev'd in part sub nom. Ramirez v. TransUnion, LLC*, 951 F.3d 1008 (9th Cir. 20020). "Evidence that a Experian has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an

argument that strong evidence is required to cure the Experian's disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA). Moreover, repeated noncompliance with statutory duties can establish that the Experian acted willfully. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

29.     No less than three federal Courts of Appeal have held a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

30.     Notably, the FTC has specifically warned consumer reporting agencies, including Experian, to review their procedures when a mixed file occurs.

31.     Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain a significant problem for innocent consumers, including Plaintiff.

32.     Plaintiff's claims arise out of the Experian's blatantly inaccurate credit reporting, wherein Experian published in a consumer report about Plaintiff the information of another consumer because Experian mixed Plaintiff's credit file with that of an unrelated consumer.

33.     Accordingly, Plaintiff brings claims against Experian for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

34.     As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from the Experian for its willful and/or negligent violations of the FCRA, 15 U.S.C. § 1681, *et seq*., as described herein.

## PARTIES

35.     Plaintiff is a natural person residing in Norcross, Georgia, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

36.     Experian is a corporation with a principal place of business located at 475 Anton Boulevard Costa Mesa, California 9262, and is authorized to do business in the State of Georgia, including within this District.

37.     Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

## JURISDICTION AND VENUE

38.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

39.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATUTORY BACKGROUND

### Summary of the Fair Credit Reporting Act

40.    The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

41.    The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

42.    Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

43.    To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

44.    The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

### Experian's Processing of Credit Information

45.    Experian regularly receives information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, and others.

46.    These sources are known as "furnishers" within the credit reporting industry and under the FCRA.

47.    Experian collects information from thousands of furnishers.

48.    The process by which Experian receives, sorts, and stores information is largely electronic.

49.    Furnishers report credit information to Experian through the use of coded tapes that are transmitted to Experian on a monthly basis through software

known as Metro 2.

50.     Experian takes credit information reported by furnishers and creates consumer credit files.

51.     Experian maintains credit files on more than 200 million consumers.

52.     Credit files are updated electronically by the furnishers to reflect new information regarding the reported accounts (sometimes referred to within the industry as "tradelines").

**Experian's Mixed File Problem**

53.     Experian knows that different consumers have similar names.

54.     Experian knows that different consumers have similar Social Security Numbers.

55.     Experian knows that different consumers with similar names also have similar Social Security Numbers.

56.     Experian knows that public records often contain identifying information such as Social Security Numbers or dates of birth.

57.     Experian matches tradelines and public records to a consumer credit file by comparing the information about the consumer associated with the tradeline or public record to the information they maintain about the consumer in the consumer's credit file or files.

58.     Experian accomplishes this matching of credit information to consumer credit files through the use of certain matching algorithms or database rules.

59.     From time to time, Experian's matching algorithms match information belonging to one consumer to the credit file of another consumer, resulting in what's commonly known as in the credit reporting industry as a mixed or merged credit file.

60.     Mixed files are not a new phenomenon. In fact, as long ago as the early 1990s, the FTC (the government agency charged with enforcement of the FCRA), entered into individual Consent Decrees with each of the major CRAs, specifically including Experian, regarding its significant failures and deficiencies with respect to mixed files.

61.     Despite Experian's long-standing and specific knowledge of the mixed file problem, Plaintiff's credit report was still generated by Experian containing information belonging to another consumer.

62.     A mixed or merged credit file is the result of Experian's inaccurately mixing personal identifying information and credit information and/or an entire credit file belonging to one consumer into the credit file of another consumer.

63.     There are many different possible causes for the mixing of credit files but all of them relate in one way or another to the algorithms and/or database rules used by Experian to match personal identifying information and credit information, including public record information, to a particular consumers' credit file.

64.     The success or failure of these algorithms or rules is both a function of the rules themselves and of the information provided by the furnishers of the tradeline information to Experian.

65.     A mixed consumer report could be caused by an improper algorithm just as it could be caused by the inaccurate reporting of a consumer's personal "indicative" information (e.g., name, Social Security Number, address, date of birth, etc.) by the furnishers to Experian.

66.     Accordingly, the database rules determine which credit files are selected by the algorithm and merged to create a complete consumer report.

67.     Therefore, a mixed consumer report is sometimes the result of the mixing of two or more consumer credit files belonging to different consumers into one consumer report.

## FACTUAL ALLEGATIONS

### Plaintiff's November 2023 Mortgage Pre-Approval Application

68.     Plaintiff is a husband, a father, and the primary breadwinner for his family.

69.     Plaintiff and his wife had been interested in becoming homeowners for quite some time as rent prices have skyrocketed, and so that Plaintiff and his wife can leave something behind for their daughter.

70.     Plaintiff and his wife have spent considerable time and effort since 2021 to improve their credit scores in preparation for purchasing a home.

71.     In late 2023, the timing was right for Plaintiff and his wife to apply for a mortgage. Accordingly, on or about November 15, 2023, Plaintiff completed and submitted a mortgage pre-approval application with US Mortgage Corporation ("US Mortgage").

72.     For US Mortgage to evaluate Plaintiff's creditworthiness, it would need to obtain copies of his credit files. Plaintiff provided US Mortgage with his personal identification information – including his Social Security Number – and authorized US Mortgage to obtain copies of his credit files.

73.     On or about November 15, 2023, US Mortgage ordered a tri-merge consumer report about Plaintiff from non-party Xactus, LLC ("Xactus").

74.     To create the tri-merge consumer report ordered by US Mortgage, non-party Xactus requested and obtained consumer credit information about Plaintiff from Experian and non-parties Equifax Information Services, LLC ("Equifax") and Trans Union, LLC ("Trans Union") and sold a tri-merge consumer report to US Mortgage on November 15, 2023.

**US Mortgage Denies Plaintiff's Mortgage Pre-Approval Application**

75.     On or about November 15, 2023, US Mortgage received and reviewed the Xactus report about Plaintiff.

76.     Upon information and belief, on or about November 15, 2023, US Mortgage denied Plaintiff's mortgage pre-approval application in reliance on information contained in the Xactus report which included information from Experian concerning Plaintiff.

77.     Upon information and belief, Plaintiff's mortgage pre-approval application was denied due to a debt-to-income ("DTI") ratio that was too high.

78.     The DTI was calculated based upon the contents of the Experian information published to US Mortgage about Plaintiff.

79.     Upon review of the tri-merge report, Plaintiff was shocked and confused because the Xactus report was labeled "potential score improvement" and Plaintiff had been working hard over the last year to reduce his debt.

80.     Shocked, worried, and confused, Plaintiff reviewed a copy of the report that US Mortgage relied upon in denying his mortgage application. Upon reviewing, Plaintiff was surprised to find information reported by Experian that did not belong to Plaintiff at all.

81.     Specifically, Experian was reporting names, a Social Security Number, and a year of birth that did not belong to Plaintiff. Rather, this inaccurate information belonged to Plaintiff's brother, Santiago Vera.

82.     Experian was also reporting a CarMax tradeline (account no. 5080XXXX, the "CarMax Account"), that did not belong to Plaintiff.

83.     The CarMax Account indicated that it had been opened on July 9, 2023, and had a current balance of $18,613.

84.     Plaintiff did not finance the purchase of a vehicle from CarMax in 2023.

85.     However, Plaintiff was aware that his brother had recently purchased a vehicle with their mother.

86.     Plaintiff contacted his mother and brother, who confirmed that they had not used Plaintiff's personal identifying information when purchasing the vehicle.

87.     In short, for reasons unknown, Experian was inaccurately reporting information about his brother's auto loan within Plaintiff's credit report.

88.     Plaintiff noticed that there were no soft or hard inquiries from CarMax on his Experian credit report. Therefore, upon information and belief, Experian had reason to believe that the CarMax Account may have been associated with an individual other than Plaintiff.

89.     Thereafter, Plaintiff and his wife visited their local CarMax location in order to try to obtain additional details about the CarMax Account appearing in his Plaintiff's credit report. Unfortunately, the CarMax representative with whom Plaintiff spoke was only able to tell Plaintiff that the CarMax Account was associated with a Ford Explorer, which was a vehicle that did not belong to Plaintiff.

90.     A CarMax representative provided Plaintiff with a telephone number for the CarMax Assistant Business Operations Manager who was located in New

York. The CarMax representative also suggested that Plaintiff file a police report for identity theft.

91.     Plaintiff's brother and mother agreed with the CarMax representative and also insisted Plaintiff file a police report. Accordingly, on or about November 20, 2023, Plaintiff called the police to report that his identity had been stolen.

## Plaintiff's Mixed Credit File

92.     Upon information and belief, Experian mixed Plaintiff's credit file with Santiago Vera's.

93.     Experian inaccurately published in the consumer report to US Mortgage one or more pieces of information that did not belong to Plaintiff.

94.     Experian inaccurately published in the consumer report to US Mortgage one or more pieces of information, such as an account, debt, and personal identifying information, all of which belonged to Santiago Vera.

95.     Experian mixed Plaintiff's consumer file with that of Santiago Vera.

96.     Santiago Vera and Plaintiff have different Social Security Numbers and different dates of birth.

97.     By reporting the aforementioned credit account and possibly other personal information in the credit file presumably about Plaintiff, despite the fact that the account and information did not belong to Plaintiff, Experian failed to follow reasonable procedures to assure the maximum possible accuracy of the information

contained within Plaintiff's credit files and consumer reports, in violation of 15 U.S.C. § 1681e(b).

**Plaintiff Sustained Damages as a Result of Experian's Conduct**

98.    As a direct result of the inaccurate information reported by Experian, Plaintiff has sustained severe emotional distress. Specifically, Plaintiff has suffered from substantial amounts of anxiety and stress due to Experian's reporting information on Plaintiff's consumer reports that do not belong to him.

99.    When Plaintiff was denied a mortgage, he felt physically shaken; his heart began beating quickly and Plaintiff was unable to breathe. Both Plaintiff and his wife broke down in tears when they learned that they were being denied a mortgage after all of their hard work and efforts to secure the same.

100.   Plaintiff's daughter also started crying because her father worked hard but was still denied a mortgage.

101.   As a result of the "mixed file," Experian made it practically impossible for Plaintiff to obtain credit.

102.   Plaintiff has also suffered with issues related to loss of sleep, as Plaintiff's constant state of anxiety and distress has regularly made it difficult for Plaintiff to fall asleep and/or stay asleep throughout the night.

103.   Plaintiff often lays down to go to bed but is unable to fall asleep because he keeps thinking about the inaccurate reporting and his inability to provide a home

for his family due to the same inaccuracy.

104.   Plaintiff has started taking magnesium after dinner to help him relax before he goes to sleep.

105.   Plaintiff has also been distracted at work because his mind keeps drifting back to the inaccurate reporting. Plaintiff often finds himself preoccupied with Experian's inaccurate reporting, and wonders why this has happened to him.

106.   Furthermore, due to the inaccuracies on Plaintiff's credit file, Plaintiff is afraid to apply for a home loan as he is certain that he will be denied.

107.   Due to Experian's inaccurate reporting, Plaintiff was forced to forego his aspiration of purchasing a home for him and his family.

108.    Plaintiff has felt depressed and hopeless as a result of Experian's inaccurate reporting on Plaintiff's credit file.

109.   Plaintiff is terrified of what this means for his future, including his ability to purchase a home for his family.

110.   At all times pertinent hereto, Experian was acting by and through its agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Experian herein.

111.   At all times pertinent hereto, Experian's conduct, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless,

grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

112.   Experian is aware of the shortcomings of its procedures and intentionally chose not to comply with the FCRA to lower its costs. Accordingly, Experian's violations of the FCRA are willful.

113.   As a result of Experian's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy

114.   Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

115.   The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

116.   On at least one occasion, Experian prepared patently false consumer reports concerning Plaintiff.

117.   Experian mixed another consumer's personal and credit account information into Plaintiff's credit file, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

118.   Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

119.   As a result of Experian's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, damage by loss of credit; loss of ability to purchase and benefit from his good credit rating; detriment to his credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit

information, including inquiries, mixed into Plaintiff's credit file.

120.   At all times pertinent hereto, Experian has been on notice that its procedures are likely to violate the FCRA by mixing the consumer credit information of one consumer with that of another. Therefore, Experian's conduct, actions, and inactions was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, Experian was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

121.   Plaintiff is entitled to recover attorneys' fees and costs from Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for the following relief:

i.   Determining that Experian negligently and/or willfully violated the FCRA;

ii.   Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.   Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.   Granting further relief, in law or equity, as this Court may deem appropriate and just.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED,

Dated: February 15, 2024

By: */s/Jenna Dakroub*
Jenna Dakroub, GA #385021
CONSUMER ATTORNEYS
260 Peachtree Street NW, Suite 2200
Atlanta, GA 30303
T: (602) 807-1525
F: (718) 715-1750
E: jdakroub@consumerattorneys.com

**CONSUMER ATTORNEYS**
8245 N. 85th Way
Scottsdale, AZ 85258
*Attorneys for Plaintiff,*
*Javier Morales Vera*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 15, 2024, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notice of such filing to all attorneys of record in this matter. Since none of the attorneys of record are non-ECF participants, hard copies of the foregoing have not been provided via personal delivery or by postal mail.

**CONSUMER ATTORNEYS**

By: */s/ Irina Iakovleva*
Irina Iakovleva